## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GERMAINE SMITH-BEY                           *

Plaintiff                                    *

v                                            *          Civil Action No. JKB-19-2375

WARDEN,                                      *
MAHBOOBEH MEMARSADEGHI, M.D.,
LAWRENCE MANNING, M.D.,                      *
WEXFORD HEALTH SOURCES, INC.,
MEGHAN NEUMANN, ADON,                        *
CRYSTAL JAMISON, R.N.,
MAKSED CHOUDREY, M.D.,                       *
JUSTIN BUSSARD, P.T.,
CHANTAL N. TCHOUMBA, N.P.,                   *
MUNJANJA Y. LITELL, N.P.,
CONSULT PANEL,                               *

Defendants[1]                                *
                                         ***

## MEMORANDUM OPINION

Plaintiff Germaine Smith-Bey, an inmate at Roxbury Correctional Institution ("RCI") in

Hagerstown, Maryland, alleges in this Amended Complaint filed pursuant to 42 U.S.C. § 1983,

and supplements filed at court direction, that Defendants provided constitutionally inadequate

medical care for his left knee condition. ECF Nos. 1, 3, 6. On February 10, 2020, Mahboobeh

Memarsadeghi, M.D., Lawrence Manning, M.D., Munjanja Litell, N.P., Crystal Jamison, P.A.,

Chantal Tchouomba, N.P., and Wexford Health Sources, Inc.[2] filed a Motion to Dismiss or, in the

---

[1] Service was not obtained on the Warden, Justin Bussard, P.T., or the Consult Panel. The Clerk shall amend the docket to reflect the correct spelling and full names of Mahboobeh Memarsadeghi, M.D. and Meghan Neumann. The Complaint raises no claims against the Warden, who will be dismissed.

[2] Wexford Health Sources, Inc. ("Wexford") was the contractual medical provider for inmates in Maryland correctional facilities until January 1, 2019, when Corizon, Inc. became the medical contractor. Declaration of Mahboobeh Memarsadeghi, M.D., ECF No. 25-5 at 1; Declaration of Maksed Choudry, M.D. ECF No. 30-2 at 1. Defendants were employed by these contractors over the course of the matters at issue. Plaintiff did not name Corizon, Inc. as a Defendant.

Alternative, Motion for Summary Judgment. ECF No. 25. On February 17, 2020, counsel for Lawrence Manning, M.D., Crystal Jamison, P.A., Maksed Choudry, M.D., Chantal Tchoumba, N.P., Munjanja Litell, N.P., and Meghan Neumann, Assistant Director of Nursing, filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, which was supplemented on February 18, 2020. ECF Nos. 28, 30. Plaintiff filed a Response in opposition in which he also asks for discovery and appointment of counsel. ECF No. 35 at 14. Defendants Lawrence Manning, M.D., Crystal Jamison, P.A., Maksed Choudry, M.D., Chantal Tchoumba, N.P., Munjanja Litell, N.P., and Meghan Neumann filed a Reply. ECF No. 36. Also pending is Plaintiff's Motion for Preliminary Injunctive Relief, ECF No. 4, and "Motion for Supplement of Claims," and Defendants' Response in opposition. ECF Nos. 37, 38.

For the reasons that follow, Defendants' Motions (ECF Nos. 25, 28) ARE GRANTED in PART and DENIED IN PART. Plaintiff's requests for appointment of counsel and discovery (ECF No. 35) ARE GRANTED. Plaintiff's Motion for Preliminary Injunctive Relief (ECF No. 4) IS DENIED. Plaintiff's Motion for Supplement of Claims (ECF No. 27) IS DENIED without prejudice.

## I.    BACKGROUND

Plaintiff, 39 years old, injured his knee in 2002 by jumping over a wall. *See* Declaration of Lawrence Manning, M.D., ECF No. 30-4 at 2–3. Plaintiff underwent an arthroscopy in 2014 and an ACL (anterior cruciate ligament) repair on January 8, 2016. *Id.*

Plaintiff initiated this action on August 16, 2019, by filing a complaint alleging that his 2016 ACL surgery was unsuccessful and he continues to suffer knee pain and instability. ECF No. 1. He alleged that an MRI performed in 2019 showed his left knee condition had worsened. *Id.* at 2. He contends "new injuries" to his knee are "a direct result of the faulty medical care and

2

failed surgical procedures (two) and continued inaction on the part of this medical provider to provide me with adequate medical care and surgical procedures which has caused my knee to deteriorate way worse than it was before surgery." *Id.* at 1.

On September 4, 2019, the Court ordered Plaintiff to provide additional information. ECF No. 2. Plaintiff responded and requested preliminary or permanent injunctive relief. ECF No. 4-1 at 1. Plaintiff was directed again to provide additional information, which he did on November 1, 2019, and the filing was docketed as an Amended Complaint. ECF No. 6.

In an earlier case, *Smith-Bey v. Patterson, et al.*, Civil Action No. JKB-15-1921 (D. Md. 2016), Plaintiff, then incarcerated at Maryland Correctional Institution-Hagerstown ("MCIH"), raised an Eighth Amendment claim of inadequate medical treatment for a torn ACL in his left knee and for delays in returning him for follow-up surgery. This Court determined that the Defendants in that case had provided continuing medical care for Plaintiff's knee, and although their requests to provide orthopedic consultations, physical therapy, and a knee brace for him in some instances took months to process, there was no evidence they had acted with reckless disregard to his health and safety or purposefully acted to delay prescribed treatment in violation of his constitutional rights. Accordingly, on May 17, 2016, the Court granted Defendants' Motion for Summary Judgment. *Id.,* ECF No. 21 at 3–21; ECF No. 22.[3] Because the record in that case showed that on November 20, 2015, Plaintiff had been approved for ACL reconstructive surgery, but did not indicate whether the surgery had been performed, the Court also ordered Defendants to file a status report within 30 days to state when and if the surgery occurred. *Id.,* ECF No. 21 at 15, 23; ECF No. 22. On June 3, 2016, Defendants filed a status report which stated that on January 8, 2016,

---

[3] In the instant case, Plaintiff asks for preliminary injunctive relief to reconsider the grant of summary judgment in his earlier case, *Smith-Bey v. Patterson, et al.*, Civil Action No. JKB-15-1921, ECF No. 4, 6. Plaintiff fails to address, nor can the Court discern from the record, any facts or legal arguments supporting this extraordinary request, and it will be denied.

3

Roy Carls, M.D., an orthopedic surgeon, performed the ACL surgery on Plaintiff's left knee without complications. *Id.*, ECF No. 23. The Court ordered the case closed on June 6, 2016. *Id.*, ECF No. 24; ECF No. 25-4 at 3–4.

### A. Plaintiff's Allegations

Plaintiff asserts three claims. At the heart of the Amended Complaint is Plaintiff's claim that his 2016 ACL surgery was unsuccessful and Defendants failed to provide adequate medical care for his pain and worsening knee condition. Next, he claims he must wear shackles in spite of his medical issues. Finally, he claims the Inmate Grievance Office ("IGO") improperly dismissed his grievance concerning his medical care. ECF No. 1 at 1; ECF No. 6.

On December 12, 2018, Dr. Manning, an orthopedist, evaluated Plaintiff. Dr. Manning recommended for Plaintiff an x-ray of the lumbar spine, an MRI of his left knee, physical therapy to strengthen the left leg, and knee braces. He recommended assigning Plaintiff to a cell on the bottom tier and a bottom bunk. ECF No. 25-5 at 8; ECF No. 25-4 at 93.

On March 20, 2019, Plaintiff had an MRI at Bon Secours Hospital. ECF No. 30-2 at 4. After returning from the hospital, he submitted "numerous sick calls [to obtain] the results of the MRI as well as for compliance with Manning's orders and instructions[.]" ECF No. 6 at 7.

Plaintiff claims that after he "fell in 2019," he learned Dr. Manning had requested the MRI and he "needed surgery right away." ECF No. 6 at 10.

Plaintiff states that on July 8, 2019, "Nurse Yvonne" explained to him that the test results showed new Grade 2 tears were causing his increased pain, and she submitted a request for immediate surgery or an orthopedic consultation with Dr. Manning. Dr. Manning instructed Plaintiff to contact medical if he did not hear anything in ten days. ECF No. 6 at 7–8. Plaintiff alleges that after ten days passed without further information, Plaintiff complained to medical and

4

submitted a sick call request slip.  He received no response until 30 days later when Nurse Laurie advised him there was no record of a new Grade 2 tear or a request for an orthopedic consultation or surgery.  ECF No. 6 at 8.

Plaintiff contacted Meghan Neumann, Assistant Director of Nursing at RCI who acknowledged that it is her job to submit consultations.  *Id.* at 8.  Neumann allegedly advised that the "panel" refused the consultation "or compliance with the doctor's order." ECF No. 7 at 8–9.  Neumann allegedly told Plaintiff that "it is what it is . . . write it up." ECF No. 6 at 9.

Plaintiff alleges that during pain management and other medical visits, "the consistent theme" was that (1) the panel refused it; (2) there was no medical evidence indicating additional treatment was needed; or (3) submit another sick call request if he did not hear anything soon.  *Id.*  Plaintiff asserts "[e]ach medical defendant was clearly advised of the new grade 2 tears," his pain and discomfort, and "the failure of medical staff to provide[] follow-up treatment[,] once the MRI results were made known."  *Id.* at 8.  Plaintiff complained to Dr. Choudry, who Plaintiff alleges "did nothing to secure either a consultation, further review by an on-site orthopedist or to communicate the necessary information to [Dr.] Manning, so[] proper action could be taken to provide constitutional minimums of medical treatment[.]"  *Id.* at 9.  Plaintiff alleges that Dr. Memarsadeghi examined him and told him that he needed surgery right away, yet did "nothing" to secure the treatment needed, even though she claimed to have submitted two consultation requests, both of which were refused by the "Panel."  *Id.* at 10.

Plaintiff alleges that he was advised that "between five and 10 consultations were denied by the panel," and the "general theme" of the explanations were the cost of treatment.  *Id.*  He does not indicate who advised him of this information.  Plaintiff claims "all defendants" are responsible for his medical care and for arranging for his specialized medical care and that qualified staff knew

that he needs surgery and further treatment, but they abandoned him. *Id.* at 11.

Plaintiff seeks compensatory damages of $1 million, punitive damages of $50,000 against each member of the "consult panel," and injunctive and declaratory relief. *Id.* at 12.

## B.    Defendants' Evidence

### 1.    Medical Records

Defendants have filed declarations and verified copies of more than 300 pages of Plaintiff's verified medical records to support their dispositive motions and declarations. The below is a summary of relevant information contained in these submissions.

After knee surgery in 2016 performed by Dr. Roy Carls, Plaintiff was discharged to the infirmary at MCIH for postoperative care. He was then discharged in stable condition to the general prison population with medication to keep on his person and recommended exercises to perform. Plaintiff later showed signs of infection and was prescribed Bactrim, an antibiotic. Plaintiff was also provided physical therapy. ECF No. 25-4 at 11–13, 95–101, 103–125. On May 23, 2016, Dr. Carls recommended quadricep strengthening exercises, use of a knee brace, and cortisone shots for Plaintiff. *Id.* at 13.

Plaintiff presented health providers with ongoing complaints of knee pain after his surgery in 2016. Declaration of Mahboobeh Memarsadeghi, M.D., ECF No. 25-5 at 2–3; ECF No. 25-4 at 5–13, 16, 18, 22–23.

On December 29, 2016, Plaintiff told Dr. Thompson, a medical provider, that he was given the wrong knee brace, that he was resuming post physical therapy exercise, that he was suffering worsening left knee pain, and that he obtained some relief from NSAIDs. Thompson prescribed Tramadol 50 mg., two tablets twice daily, Naproxen 500 mg., and glucosamine chondroitin. ECF No. 25-5 at 3–4; ECF No. 25-4 at 29, 31.

6

In March 2017, Dr. Choudry examined Plaintiff, who exhibited decreased range of movement and left knee tenderness. Choudry renewed Plaintiff's prescriptions for Ultram, Naproxen and glucosamine chondroitin. ECF No. 25-5 at 4.

In April 2017, Plaintiff returned his cane, but continued to complain about knee pain and instability. An x-ray of the left knee was ordered, and his pain medications were continued. ECF No. 25-5 at 4; ECF No. 25-4 at 35–38, 41–42.

On September 7, 2017, Dr. Tessema requested an orthopedic consultation for Plaintiff. ECF No. 25-5 at 4; ECF No. 25-4 at 44.

On November 3, 2017, Plaintiff reported bilateral knee pain, with the left knee worse than the right, and that his left knee gave out when he used a cane and brace. Dr. Memarsadeghi noted Plaintiff had a left knee brace and the August orthopedic[6] consultation request had not been approved. An anterior drawer test for ACL integrity was positive.[7] Dr. Memarsadeghi renewed his medications. ECF No. 25-5 at 5; ECF No. 25-4 at 48.

On November 15, 2017, Plaintiff's medical chart was updated to show the November request for an orthopedics consultation was denied in favor of a physical therapy treatment plan. ECF No. 25-5 at 5; ECF No. 25-4 at 52.

On December 4, 2017, Plaintiff reported knee pain, his medications were not helping, and it hurt to walk from his cell to the medical unit or dining hall. An anterior drawer test for ACL integrity was positive. Plaintiff was moved to a cell closer to the medical unit and dining hall. Dr. Memarsadeghi ordered a new knee brace and fish oil. She concluded Plaintiff's condition was

---

[6] As noted, the record shows a request for an orthopedic consultation was placed on September 7, 2017. This is the only mention in the record of an August consultation request.

[7] An anterior drawer test is a physical examination used to evaluate the stability of the knee's anterior cruciate ligament (ACL). Doctors may use this test, along with images and other examinations, to determine if a person has injured their ACL and recommend treatment options. *See* National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov (last visited July 27, 2020).

worsening and resubmitted the orthopedic consultation request. ECF No. 25-4 at 56.

In 2018, Plaintiff continued complaining of knee pain. ECF No. 25-4 at 58, 61, 68, 72. On February 1, 2018, Crystal Jamison, P.A. noted his left knee surgery was unsuccessful, noted he had right knee pain from years of favoring his good knee, and agreed to try a Kenalog injection in his right knee. ECF No. 25-4 at 62.[8]

On April 30, 2018, Dr. Memarsadeghi renewed Plaintiff's Ultram and Naproxen prescriptions and noted that he was provided a new cane and a new knee brace. Plaintiff inquired about the status of the most recent request for an orthopedics consultation. ECF No. 25-5 at 6; ECF No. 25-4 at 65–67.

On July 17, 2018, Crystal Jamison, P.A. noted a Kenalog injection and numerous different prescribed analgesics provided Plaintiff little pain relief. Jamison observed his most recent orthopedics consultation was deferred for conservative management because he was able to use a cane to complete all activities of daily living and walk within the institution. Jamison noted Ultram can no longer be prescribed for extended periods of time and prescribed Cymbalta for Plaintiff's chronic pain as an alternative. Plaintiff asked about the status of the consultation request. ECF No. 25-4 at 73.

On July 27, 2018, Munjanja Litell, N.P. noted that Plaintiff had recently been tapered off Ultram and started Cymbalta.[9] Plaintiff reported negative side effects from Cymbalta, so Litell prescribed Elavil for pain instead. ECF No. 25-4 at 77.

In August 2018, Plaintiff complained his knee gave out when he was using a cane. ECF

---

[8] The record also shows that Plaintiff reported right knee pain, occasional back pain, and started experiencing severe stabbing pains in his left ankle. ECF No. 25-4 at 40, 41, 47, 61, 62, 55, 77, 182; ECF No. 28-4 at 189, 192, 200.

[9] Tramadol is an opioid-like medication with a risk for addiction. Long term pain management with pain relievers such as Tramadol is generally not appropriate, especially in a prison setting where the potential for abuse and diversion is significant. *See* ECF No. 30-4 at 4. Ultram is a brand name for Tramadol.

8

No. 25-4 at 79.

On October 23, 2018, Plaintiff reported no improvement after his Kenalog injection, and that his pain worsened when he had stepped backwards and felt his knee pop. Chantal N. Tchoumba, N.P. noted a prior request for orthopedic follow up had been declined. She submitted another request for an on-site orthopedic consultation. ECF No. 25-4 at 88.

On December 12, 2018, Dr. Manning evaluated Plaintiff. The medical note states that Plaintiff had knee pain and his knees buckled when he did not wear braces, that he completed one round of physical therapy and had started a second round when he was transferred to a different institution, that cortisone injections did not relieve his pain, and that he had occasional back pain. Dr. Manning observed Plaintiff walked with a cane, had mild atrophy of the lower left extremity, had tender anterior medial left knee with active range of motion 5-105 degrees, no large effusion, exhibited considerable guarding with pain when testing the ligaments, including ACL ligament, and that his October 1, 2018 x-ray showed "post operative changes since ACL reconstruction and degenerative changes." ECF No. 25-5 at 8; ECF No. 25-4 at 93. While Plaintiff reported pain upon examination of his knee, Dr. Manning stated he did not note any complaints from Plaintiff that his medication regimen was insufficient to manage his left knee pain. Declaration of Lawrence Manning, M.D., ECF No. 30-4 at 3. Manning assessed Plaintiff as having "internal derangement of the left knee" and recommended an x-ray of the lumbar spine, a left knee MRI, physical therapy to strengthen the left leg, continued use of knee braces, and assignment to a cell on the bottom tier and a bottom bunk. Manning recommended a follow up visit when the MRI results became available. ECF No. 25-4 at 93.

On January 2, 2019, Chantal Tchoumba, N.P saw Plaintiff for chronic knee pain. ECF No. 28-4 at 182. Plaintiff again reported his pain had worsened recently after he took a step back and

9

felt his knee pop. Tchoumba prescribed Glucosamine Chondroitin and Biofreeze (muscle rub) and submitted a physical therapy request. ECF No. 30-2 at 2–3.

On January 5, 2019, Munjanja Litell, N.P. reviewed the results of the lumbar spine x-ray with Plaintiff and noted a request for an MRI of his left knee was pending approval. ECF No. 30-2 at 3; ECF No. 28-4 at 185, 187.

On March 5, 2019, Plaintiff was evaluated for physical therapy. ECF No. 28-4 at 203–04. Plaintiff was provided physical therapy on March 7, 14, 26, and 28, and on April 4, 9, 11, and 16. ECF No. 30-2 at 4–6.

On March 20, 2019, Plaintiff had an MRI of his left knee which showed an anterior cruciate ligament (ACL) graft failure, progressive arthritic changes with chondromalacia (deterioration of knee cartilage) in the medial and lateral compartments, degeneration of the posterior horns and bodies of both the medial and lateral menisci, a new grade 2 tear of the fibular collateral ligament, a chronic sprain of the MCL (medial collateral ligament), and low-grade patellar chondromalacia. ECF No. 28-4 at 68; ECF No. 30-2 at 4.

On May 23, 2019, Crystal Jamison, P.A. noted that Plaintiff's MRI report was unavailable and that his appointment would be rescheduled once the report had been obtained. ECF No. 30-2 at 5.

On June 3, 2019, Nurse Practitioner Litell saw Plaintiff for a follow-up to his left knee MRI. ECF No. 30-2 at 7. Litell ordered a new brace for Plaintiff and requested an evaluation by Dr. Manning. *Id.*; ECF No. 28-4 at 227.

On July 8, 2019, Dr. Manning saw Plaintiff who reported lateral and medial knee pain, stabbing pain, and knee buckling. Plaintiff reported Depakote provided no relief. He stated his knee brace was damaged and he needed a replacement. Dr. Manning reviewed the MRI, which

showed an ACL graft failure, degeneration, a new Grade 2 tear of the fibular collateral limits, a chronic sprain of the medial collateral ligament, and buckling of the posterior cruciate ligament. He assessed Plaintiff with internal derangement of the left knee. He advised Plaintiff to continue to use his cane and referred him to a sports medicine orthopedist for possible arthroscopy and ACL reconstruction. Manning issued a replacement of the patient's left knee brace and recommended Biofreeze. ECF No. 28-4 at 225; ECF No. 30-4 at 3–4; ECF No. 30-2 at 7–8.

On August 6, 2019, Chantal Tchoumba, N.P ordered Mobic and Biofreeze for pain relief. Tchoumba also submitted a request for an evaluation for arthroscopy and ACL reconstruction by a sports medicine orthopedist, and requested a pain management committee evaluation for Plaintiff. ECF No. 28-4 at 239, 242–44.

On September 30, 2019, Plaintiff was evaluated in the Hagerstown Multidisciplinary Pain Clinic for alternative recommendations for his chronic knee pain. ECF No. 28-4 at 249–50. Plaintiff described the left knee pain as sharp and stabbing, and reported that physical therapy worsened his pain and that he had fallen multiple times. He reported minimal relief while on Tramadol and stated that other medications, including Depakote, Mobic, Elavil, Cymbalta, Naproxen, and Neurontin had been ineffective for his complaints. It was recommended that he continue Glucosamine Chondroitin and Biofreeze; begin Tramadol until his orthopedic appointment; and use Mobic, based on his report of limited activities of daily living due to knee pain. ECF No. 30-2 at 8.

On October 9, 2019, Dr. Choudry informed Plaintiff that the pain committee recommended Tramadol for three to six months until he was cleared by an orthopedist. ECF No. 30-2 at 9. Narcotics are not used for pain in the prison unless approved by the pain committee. ECF No. 25-4.

In November 2019, Dr. Ashok Krishnaswamy, an orthopedic surgeon, evaluated Plaintiff for a possible arthroscopy and ACL reconstruction. ECF No. 28-4 at 277–78.

On December 2, 2019, Nurse Practitioner Litell told Plaintiff that Dr. Krishnaswamy recommended arthroscopy of the left knee with calcium subchondroplasty but Plaintiff felt this was "experimental medicine" and wanted to see another doctor. Plaintiff said Dr. Krishnaswamy performed one of his previous surgeries (in 2014) and that he subsequently filed a complaint against him.[10]  Plaintiff asked to see another doctor.  Litell referred Plaintiff back to the pain committee because he reported his regimen was insufficient to control his pain. ECF No. 28-4 at 277–78.

Dr. Choudry states that Dr. Krishnaswamy is a competent and experienced orthopedic surgeon.  The procedure recommended by Dr. Krishnaswamy, an arthroscopy with a calcium subchondroplasty, is not, as Plaintiff alleges, "experimental." ECF No. 30-2 at 10.  Dr. Choudry attests he has "no reason to believe that any aspect of Dr. Krishnaswamy's care has been or will be affected by the patient's complaints against him." *Id.*

### B. Defendants' Declarations

Meghan Neumann submitted a declaration stating that she does not have the authority to dictate the course of any patient's medical treatment in her capacity as assistant director of nursing and as a registered nurse.  She can place orders made by higher-level medical providers, such as nurse practitioners and doctors, but she cannot prescribe medications, order laboratory tests, or order diagnostic testing.  Further, she does not submit, review, or provide input on requests for off-site specialist consultations for any patient.  Neumann defers to the medical judgment of higher-level medical providers to determine the appropriate course of treatment for a patient, and does

---

[10] Dr. Krishnaswamy was not a defendant in Plaintiff's earlier case. *Smith-Bey v. Patterson, et al.,* Civil Action No. JKB-15-1921 (D. Md. 2016).

not oversee decisions of higher-level medical providers. Neumann denies ever informing Plaintiff that his surgery was unsuccessful or that a "panel" refused a consultation request. Declaration of Meghan Neumann, ECF No. 30-3 at 2. Regarding Plaintiff's allegation that she instructed him to write up his complaints, she explains that she advised him how to submit requests for medical treatment. She states: "I did not deny the patient's requests for medical treatment; rather, I instructed him as to how to properly obtain medical treatment." *Id.* at 3.

Neumann states inmates are required by correctional staff to wear shackles when they attend off-site appointments. After Plaintiff informed her that the shackles were uncomfortable for him, she discussed his concerns with the RCI Chief of Security. The Chief of Security determined that Plaintiff must wear shackles on off site visits due to security concerns. Neumann attests that neither she nor any other medical provider can override the decisions of correctional staff. Further, she is unaware "of any risk of serious harm to [Plaintiff] from wearing shackles to his occasional off-site appointments." *Id.*

Lawrence Manning, M.D. submitted a declaration stating that as an on-site orthopedist, he makes recommendations and defers to the inmate's medical provider to determine whether to implement those recommendations. ECF No. 30-4 at 2. Manning is not involved in scheduling on-site or off-site medical appointments, or reviewing requests for medical services and consultations that cannot be provided on-site at the correctional facility, such as diagnostic testing or specialist appointments. ECF No. 30-4 at 3.

## II.    Applicable Standard of Review

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the

13

defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Defendants style their motions as motions to dismiss or for summary judgment, and both Defendants and Plaintiff have submitted evidence outside of the original pleadings for the Court's review. The Court may consider the exhibits only if it converts the motions into motions for summary judgment. *See* Fed. R. Civ. P. 12(d). Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2012). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56.

"The Fourth Circuit places 'great weight' on the affidavit requirement." *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 683 (D. Md. 2013) (quoting *Evans*, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods*, 302

14

F.3d at 244.  Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." *Id.* (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

In his Opposition Response, Plaintiff requests that he be granted discovery to further explore the facts underlying his claims and to obtain the names of the members on the "consult panel" who reviewed the requests submitted by medical providers for orthopedic consultations. Plaintiff also asserts that he has submitted his "brief or declaration" to explain why summary judgment should not be granted before discovery.  ECF No. 35 at 6–7, 14.  Plaintiff, however, provides no verified declaration or affidavit with his submission.[12]

Though Plaintiff has technically failed to comply with the affidavit requirement, the Court will excuse this failure, in light of Plaintiff's *pro se* and incarcerated status.  Setting aside the formal issue with Plaintiff's presentation of his request, Plaintiff has made clear that he needs discovery to explore relevant facts exclusively in the control of the Defendants—including the identities of the members of the consult panel and the motivations underlying the decisions of his medical providers.  Plaintiff has effectively shown that summary judgment would be premature at this stage.  Therefore, the Court will analyze Defendants' motions under the motion to dismiss standard.

### III.    Discussion

#### A.    IGO Claim

Plaintiff claims that inmate complaints about medical care are considered through the ARP

---

[12] In the Opposition Response, Plaintiff states: "Find enclosed an Affidavit of the Plaintiff, that attempts to address areas which Plaintiff may have missed as an oversight."  ECF No. 35 at 6.  However, Plaintiff has not filed his affidavit—though he has filed the declarations of several fellow inmates concerning his knee pain.  ECF No. 35-1 at 5–7.

process but, once they reach the IGO, the Director asserts the IGO has no jurisdiction to consider medical complaints. ECF No. 6 at 11. Plaintiff appears to have pursued his medical concerns to the IGO, which dismissed the matter as outside its jurisdiction. In *Adamson v. Correctional Medical Services, Inc.*, 753 A.2d 501 (Md. 2000), the Court of Appeals of Maryland held that the Maryland prisoner administrative remedy process does not encompass complaints against private medical providers under contract with the state. Thus, to the extent Plaintiff presented claims against medical providers to the IGO, the IGO had no authority to address such claims. Notably, the Director of the IGO is not named as a defendant in this case, nor does Plaintiff identify a constitutional provision or federal law allegedly violated by the IGO determination. Accordingly, this claim will be dismissed.

### B. Eighth Amendment Claims

The Eighth Amendment[15] prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). A prisoner's right to be free from cruel and unusual punishment is violated when a prison official shows "deliberate indifference to the serious medical needs of prisoners" because it constitutes "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104.

> This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's

---

[15] Plaintiff also brings these claims pursuant to the Fifth and Fourteenth Amendments. ECF No. 6 at 12. The due process clause of the Fifth Amendment only applies to actions by the federal government. *Pub. Util. Comm'n of D.C. v. Pollak*, 343 U.S. 451 (1952). Plaintiffs does not allege that Defendants are federal employees or actors, so the due process clause of the Fifth Amendment does not apply. Aside from citing the Fourteenth Amendment, the Complaint contains no argument or allegations to suggest a basis for a due process claim.

serious illness or injury states a cause of action under § 1983.

*Id.* at 104–05

"A deliberate indifference claim consists of two components, objective and subjective." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The objective prong requires that the inmate have an objectively serious medical condition. *Id.* ("Objectively, the inmate's medical condition must be 'serious'—'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'") (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). The subjective component requires proof that the prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A defendant's subjective knowledge can be proven 'through direct evidence of [his] actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that [he] knew of a substantial risk from the very fact that the risk was obvious.'" *Gordon v. Schilling*, 937 F.3d 348, 357 (4th Cir. 2019) (quoting *Scinto*, 841 F.3d at 226). The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839–40; *Scinto*, 841 F.3d at 225.

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

If the requisite subjective knowledge is established, an official may avoid liability "if [he]

17

responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000). Adequate treatment must be viewed as that which "may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977).

Additionally, a Plaintiff seeking to prove a deliberate indifference claim against an entity acting under color of state law must show not only that an agent of the entity violated his Eighth Amendment rights, but also that the entity's policies or customs caused the violations. *See Powell v. Shopco Laurel Co.*, 678 F.2d 504 (4th Cir. 1983). A culpable policy, practice, or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (alterations in original) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

### 1. Shackling Claim

Plaintiff claims he complained to Memarsadeghi, Choudry, Jamison, Littell, Tchoumba, and Neumann that prison officials forced him to wear shackles despite his medical issues. He claims that these Defendants' "refusal to issue a medical order, so security will not apply shackles is deliberate indifference" to his serious medical needs. ECF No. 6 at 11.

Plaintiff's pleadings fail to establish a violation of his Eighth Amendment rights on the part of any Defendant in relation to his shackling. Undisputedly, it is correctional staff who applies the

18

shackles to Plaintiff, not Defendants. Further, Plaintiff does not allege that occasionally being made to wear shackles during off-site appointments by prison staff is either seriously injurious or painful. Thus, Plaintiff has failed to plead the requisite elements of an Eight Amendment claim against any Defendant in relation to his shackling.

### 2. Inadequate Medical Care

On the other hand, Plaintiff has effectively pled that the medical provider Defendants collectively violated his Eighth Amendment rights by failing to provide necessary treatment as his injured knee's condition and his associated pain progressively worsened. Plaintiff alleges that "[e]ach medical defendant was clearly advised of the new grade 2 tears, the pain and discomfort being complained of, and the failure of medical staff to provide the follow-up treatment needed[.]" ECF No. 6 at 8. His medical records reflect that Plaintiff complained of left knee pain in 2016, and his medical providers submitted numerous requests for orthopedic consultations starting in August or September of 2017, but that some fifteen months passed before Plaintiff was finally evaluated by Dr. Manning on December 12, 2018. The records also reflect that it was not until some three months later, on March 20, 2019, that Plaintiff had the recommended MRI, and another four months passed before he was seen again by Dr. Manning.

"A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). Delaying treatment in the face of significant pain is harm sufficient to support a finding of deliberate indifference. *See, e.g., Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978) (concluding plaintiff had stated a claim for deliberate indifference because a broken arm is an "excruciating injury" and plaintiff was denied treatment for at least eleven hours); *Webb v. Hamidullah*, 281 F. App'x 159,

19

167 (4th Cir. 2008) (explaining a plaintiff can prevail on a deliberate indifference claim if he can show a delay in treatment resulted in the exacerbation of his medical condition or "frequent complaints of severe pain").

Plaintiff's claims of pain, instability, and other alleged medical concerns, accepted as true, could establish deliberate indifference to his serious medical needs on the part of some or all medical Defendants. Though Plaintiff's pleadings are imprecise regarding the actions of particular Defendants, in light of Plaintiff's *pro se* status and the barriers preventing Plaintiff from obtaining relevant information,[16] the Court will allow the claim to proceed against each individual medical Defendant. The Court will also allow the claim to proceed as to Wexford, since, construing Plaintiff's pleadings liberally at this early stage, the Court determines he has alleged a Wexford policy, practice, or custom of denying or delaying necessary treatment.

Discovery is necessary to ascertain whether Plaintiff's allegations of constitutionally deficient medical care have merit, and if so, which Defendants may be culpable. In order to assist Plaintiff in pursuing discovery, the Court shall grant his request for appointment of counsel, and deny without prejudice the Defendant medical providers' motions for summary judgment until Plaintiff has had the opportunity to develop the factual record.[17]

---

[16] In his briefing, Plaintiff claims that "medical staff do not wear name tags or I.D. badges," and that the disruption occasioned by COVID-19 has further complicated efforts at gathering relevant information pre-discovery. ECF No. 35 at 1, 3.

[17] In his Opposition Response, Plaintiff also raises a new claim that his Tramadol (Ultram) was abruptly stopped and he suffered knee pain as a result. ECF No. 35 at 6–7. Plaintiff may not amend the Complaint to raise a new claim in this manner. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1068 (D. Md. 1991) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss") (internal citation omitted). This claim will be denied without prejudice to refiling after counsel enters an appearance in this case. Likewise, in his "Motion for Supplement of Claims" (ECF No. 37), Plaintiff asks to amend the Complaint to include the members of the consultation panel. The Motion to Supplement will be denied without prejudice. After entering an appearance, appointed counsel may move to amend the Complaint to add such individuals.

### CONCLUSION

The Motion to Dismiss or, in the Alternative, Motion for Summary Judgment filed by Mahboobeh Memarsadeghi, M.D., Lawrence Manning, M.D., Munjanja Litell, N.P., Crystal Jamison, P.A., Chantal Tchouomba, N.P., and Wexford Health Sources, Inc. (ECF No. 25) IS GRANTED IN PART and DENIED IN PART. The Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (ECF No. 28) filed by Lawrence Manning, M.D., Crystal Jamison, P.A., Maksed Choudry, M.D., Chantal Tchoumba, N.P., Munjanja Litell, N.P., and Meghan Neumann, Assistant Director of Nursing IS GRANTED IN PART and DENIED IN PART. The Warden IS DISMISSED as a defendant. Plaintiff's claim against the Inmate Grievance Office IS DISMISSED. Plaintiff's claim that he is improperly shackled IS DISMISSED. Plaintiff's Motion for Appointment of Counsel (ECF No. 35) IS GRANTED. Plaintiff's Motion for Preliminary Injunctive Relief (ECF No. 4) IS DENIED and his "Motion for Supplement of Claims" (ECF No. 37) IS DENIED without prejudice. A separate Order follows.

Dated this _6_ day of _Aug_, 2020.

FOR THE COURT:

James K. Bredar
Chief Judge